Good morning. Some of you are familiar with our procedure with the lighting system. I remind you that rebuttal is for rebuttal only. And we'll call for the first case of the day, United States of America v. Jose Segovia-Ayala. Ms. Merrick? Good morning, Your Honors. My name is Betty Merrick. I'm here today representing Jose Segovia-Ayala. I also represented him in the trial court below. With me at counsel table is a new lawyer in my office, Jasmine Henderson. She'll be writing briefs for us, so I brought her along to let her experience the Fifth Circuit. This case arises out of a traffic stop that occurred on I-20 near Shreveport about 530 in the morning. Mr. Segovia-Ayala was proceeding down the interstate. He was driving slightly below the speed limit, about nine miles under the speed limit, actually. And the trooper pulled him over for touching the fog line. We do not dispute that it is a valid traffic stop and that the trooper was justified in his actions in making the initial stop. Once Mr. Ayala was stopped, trooper began asking Mr. Segovia questions about his itinerary, his driver's license, his passengers. He spoke to them, obtained the identifications. He returned to his vehicle and he ran a check on the license and the identification cards of the passengers. At that point, the driver's license came back clean. Trooper Peart returns the passenger's identification. He comes back to the car, to his front of his vehicle where Mr. Segovia-Ayala is standing, hands him back his driver's license. And it is at this point that we allege that the unconstitutional detention began to occur. He hands him back his driver's license and simultaneously with that, he says, you know, I'm not going to give you any tickets. I'm just going to give you a warning this morning. Do you understand that? Mr. Ayala nods his head. He says, you understand, I'm not going to give you a ticket. And Mr. Ayala nods his head again. And trooper Peart then says something to the effect of, you know, I see a lot of bad stuff out here on the highway. We see a lot of illegal stuff. You don't have anything illegal in your car, do you? Mr. Segovia shakes his or responds no. And then he says, do you mind if I search your car? And Mr. Ayala, Segovia-Ayala says something to the effect of, no, my friend, or something like that, identifying that he is consenting to the search of the car. It is our position that that interval is the unconstitutional detention because he continues to question Mr. Segovia-Ayala, who is not free to leave. If you view the videotape, Mr. Segovia-Ayala never moves from his position leaning on the hood of trooper Peart's car. He, they engage in this conversation. Trooper Peart hands him the consent form. Mr. Segovia-Ayala speaks Spanish as a first language. It is clear from the conversation on the tape that he's having some difficulty understanding trooper Peart. But you're not contesting that he understood giving consent only that the delay in giving him the ticket was beyond what it should have been? No, so I'm contesting both, that there is a, so it's an unconstitutional delay, which gives us a different standard. We have an unconstitutional delay, and then we have the consent form. And I'm, my contention is that the consent form is not voluntarily signed and that Mr. Segovia-Ayala did not fully understand what he was doing. He was never advised, and I'm not, my contention is not that he has to be advised. He never understood that he was free to leave. If you watch the videotape, which is in evidence, he's handed the consent form. Trooper Peart says to him, it's up here at the top in English, it's down here at the bottom in Spanish, and you understand, you're allowing me to search your car. And you can read the Spanish part and sign. He does not say you have a right to refuse. He doesn't try to explain the form to him. He simply says it's in English and Spanish. At what point did he exit the car? I'm sorry, at what point did you exit the car? Immediately upon the stop, Trooper Peart goes to the side of the passenger side. He asked the driver to step to the rear of the vehicle, and Mr. Segovia-Ayala remains there in front of Trooper Peart's car on the dash cam for this entire time. The passengers remain in the car during this discourse. There's a passenger? There's another passenger in the car? There are two passengers in the car. One's in the passenger seat. And then there's a juvenile, actually, in the back seat. I believe he's 17, who is in the back seat of the car, who speaks no English. And so Trooper Peart hands him the consent form. Mr. Segovia treats it like a traffic ticket. If you watch the tape, he hands him the form, and he says, could you sign this? You're going to let me search your car. And Mr. Segovia-Ayala immediately signs his name. He takes no time to even read the consent form that he's been given. And then Trooper Peart and two other officers who have by now arrived on the scene begin to search the vehicle. And so it is our contention that Mr. Segovia-Ayala's consent was not knowing, free, and voluntary at that point because he didn't understand what he was doing. He doesn't read the consent form. He signs, and Trooper Peart then begins to search. And it was because of his limited understanding of English, not a Louisiana police officer's English. That sometimes it's hard to understand some Cajun people. No, if you watch, I understand what you're saying, but Trooper Peart will ask him questions. And at one point, Mr. Segovia-Ayala has a Maryland driver's license, and he's headed from Texas to Maryland. And Trooper Peart says, how long are you going to be in Maryland? And he says, eight years. And it's obvious that he asked him a few more questions. And then he comes back to, how long are you going to be in Maryland? He lived in Maryland for eight years before he went to work in Houston, and he's now traveling back to Maryland. And so they lose that in the conversation because Mr. Segovia-Ayala doesn't understand the question. Trooper Peart has to repeat a lot of them, the questions. He asks him about how many trips he's made because of the boss' license plate reader system, which is one of the factors that the trooper is considering as to why he wants to search the car. And Mr. Segovia-Ayala has a lot of trouble with that question, not because he doesn't want to answer it. He's very cooperative throughout the entire process, but he's got to figure out really what the question is. And so Trooper Peart continues to ask him questions, and he says, how many trips have you made? Why do you go to Maryland? And he says, I have family there. And he says, who are you staying with? And he says something, and Trooper Peart says, a neighbor. And he says, no, my nephew. So they're having a lot of difficulty in their communications. The finding by the magistrate of the trial court that he understood is a factual finding. Is that correct? So in reviewing that issue, what is the standard of review that this court must look at in determining whether that's a correct finding by the judge? I mean, I'm the trial court, and I hear them both. I might not agree, but I think we sort of are obligated to accept the findings, the factual findings of the trial court unless we think they're clearly erroneous. That is correct, Your Honor. You are. And I agree with that. I submit that just by viewing the tape, they are clearly erroneous, that the consent is not voluntary. It's not knowing. Mr. Segovia never had the perception that he was free to leave because of Trooper Peart's actions. And that is something that the trial court doesn't address, which is Trooper Peart is a fairly large Louisiana state trooper. I'm trying to understand the connection between his feeling free to leave and his signing the consent form. Are you maintaining that there is a connection between those two things? In other words, if he felt free to leave, he wouldn't have signed, or he signed because he didn't understand what he was signing? Both. I'm saying that Mr. Segovia Aiella really just wants this traffic stop over. He wants to be on his way. And Trooper Peart is talking to him, and it's the method that he goes about obtaining the consent. He hands him back his driver's license, but all the while engaging him in conversation. And we're taught from the time we're young to respect authority, to be compliant, you're on the side of the highway. Mr. Segovia Aiella is there just wanting to cooperate with this officer. So as long as Trooper Peart is asking him questions, Mr. Segovia Aiella is going to remain there believing that he's not free to leave. Because he's being questioned by this police officer, which is, I see a lot of bad stuff on this road. You don't have anything illegal in your car, do you? Surely there's nothing illegal in that car, is there? And so those questions . . . So your contention is the traffic stop was unlawfully extended? Yes. And then as regards his signing of the consent form, he signed a consent to search? He signed a consent to search form. Did the officer make a statement contemporaneously with handing the form to him? In other words, did he say, this is a consent for me to search your vehicle? The way it plays out, he says . . . so the answer to your question is yes. He says, Mr. Segovia Aiella, do you mind if I search your car? And my client says something, I believe it's either yes, my friend, or no, my friend, meaning that it's okay to search. We don't dispute that. And he hands him the form and says, okay, this is a Louisiana form. This is going to allow me to search your car. This top's in English. This bottom's in Spanish. Pick which one you want to sign and sign. He agreed to consent verbally before he signed the form? He did, yes. At the magistrate hearing, what form did that hearing take? Testimony taken? Testimony was taken and the form was introduced into evidence and is part of the record on the motion to suppress. Did the defendant testify at the hearing? He did not. Nor did the passengers. The magistrate had before the testimony the police officer? Yes. And the video? That is correct. So the magistrate did see the video? Yes, he viewed it actually before the proceeding, which is what he likes to do in Shreveport, so that we don't spend 35 minutes or an hour watching a video in court. So he viewed the video before. We refer to the video at various points in the proceeding. Trooper Peart is asked questions, and I believe at one point I actually played a few portions of the video in relation to the questions that I was asking Trooper Peart. But what we have, though, is an apparent oral consent to the search, right? It is, yes. Followed by a signed consent to a search. Which almost happened simultaneously. I mean, there's just a minute in there that it all happens. You say all happened, but what happened? Do you mind if I search? Yes, you may search. I'll just phrase it that way. Yes, you may search. All right, here's the form. It's English and Spanish. Sign the Spanish one. Mr. Segovia signs the Spanish one. He doesn't even take the time to read it. Then what happened? The other two troopers exit their vehicles. There are now three on the scene, and search the car. When was he handcuffed? Not until after the drugs were found. That is correct. And the search lasts approximately ten minutes or so before they find the heroin in the rear quarter panel, and at that point they handcuff him, throw him to the ground, and then they also read him his Miranda rights, or recite his Miranda rights to him in English, and then he makes some incriminating statements, which I also. . . The other passengers remained in the car? They were removed from the vehicle immediately when the search of the vehicle began and sat on the side of the road next to the place where Mr. Segovia Aiello was standing. They did not exit the car until after the consent form was signed? They were told to remain in the car. The consent form was fine. They were told to exit the car. They followed orders, yes. The officer was alone when he made the initial stop? That is unclear from the record. What Trooper Peart does say is they work in tandem when they do these stops. They have one vehicle with the drug dog in it, the other trooper, and so. . . He's going to normally call a second vehicle, depending on the circumstances, but he's got a car, he's stopping a car with two people. I'm sorry. From the police officer's perspective, it's a very dangerous situation. He's got three passengers. I agree. So he does what he's supposed to do. He approaches the right rear side and tells them to exit from that side. He's still got two more of the passengers in the car. That is correct. Okay. Now, when did the other police officers arrive? Well, that is unclear from the video. What we do know is while he's running the background check and they're talking about the boss license plate system, he says to someone who's now sitting in his car with him. There are two voices in the car, and it's not the computer dispatch. He says he's made a lot of trips, and the other person, other trooper in the car, says he's a busy bee. So they're obviously both in the vehicle at that point. It's more than he's made enough trips. I understand that he's presented a Maryland license plate. I mean driver's license. Driver's license. He's driving an older vehicle that's been recently registered in the state of Texas. That is correct. And that's a marker for drug trafficking because they register old vehicles and an out-of-state license. So a point being that it seems pretty clear to me that the officer had reasonable suspicion to continue the interrogation. Now, where is that in error? Well, once the license plate check comes back clean, the background check, he's got nothing at that point. The license plate is clean, but the problem is he's registered in Texas. He's got a Maryland driver's license, and it's an older car. And what I'm saying to you is that I'm going to the question of reasonable suspicion to continue the interrogation. Your argument has been, one of your arguments is, that the people were detained longer than is permissible, and it became an illegal stop. Yes. And I was just asking you to address that the presence or absence, in your view, of reasonable suspicion. I was suggesting to you that that would be a police officer's view. I guess I've heard too many of these cases, but that's also common sense. My time is up, but I'll answer your question very briefly, which is Mr. Segovia-Aiella explains that. He says, I'm working in Houston. I bought the car there. I registered it there, which makes sense as to he still has a Maryland driver's license. So the trooper could have cleared all of that up with a few more questions rather than the search of the car. So there's an innocent explanation, which he provided to Trooper Peart during the initial discourse before he ran the background check. He asked him about those very things. There was one other additional circumstance. He was on I-20. Was it I-20? Yes, correct. And Trooper Peart's— And he also, I guess, used his map to determine that that's not the route they're taking. It's not the most direct route. I thought that was in the record. That is in the record. Trooper Peart—and my time is up. I'm sorry. But he map-quested the route, and he should have taken I-10 to I-59 north, and that would have been the most direct route to his destination coming from Houston. Yeah. So. Okay. Ms. Griffin. Good morning, Your Honors. On behalf of the United States, my name is Mignon Griffin. Your Honor, I believe this was a valid consent given during a consensual encounter at that point between the officer and Mr. Segovia, but I will begin with Judge Higginbotham's question as to whether the officer had a reasonable suspicion to extend the stop, and I would submit that the district court correctly found that he did. In addition to the fact mentioned by Judge Higginbotham that it was an older model van only recently registered to Mr. Segovia, the trooper, upon Mr. Segovia's exit from the van, shook hands with him, and he was able to observe at that time that Mr. Segovia's palms were very sweaty. He also testified that the vein in Mr. Segovia's neck was pulsing visibly. Which happens to me every time a blue light goes on behind me. And I don't think that standing in isolation, that would be enough, Your Honor, but when added together with all these other things, I agree. My pulse races when I see the police car pull out, and I pray they're going after somebody other than me, although I confess I led foot. Mr. Segovia identified the people in his van as his friends. He said that he had known them for six months, but when Trooper Peart asked Mr. Segovia for their names, he could not provide them. He said that he knew the passenger as Flacco, or he called the passenger Flacco, but he had no idea of his rear passenger's name. When the trooper approached the van to speak to the passengers, Mr. Flacco was only able to produce a Mexican ID. The rear seat passenger had no ID on him at all and spoke no English. The trooper also noticed both times that he approached the van on the initial stop and when he walked back up to speak to the passengers after speaking to Mr. Segovia, that there was a strong ammonia smell emanating from the van. And as he walked past the van, by this point, he knew from Mr. Segovia that the three men were going to Maryland for a week. The trooper noticed that there was only one piece of luggage in the rear of the van, and he found it odd that three adult males would have only one piece of luggage for such a lengthy trip. He also had noted, as Ms. Merrick said, from the BOSS system, that Mr. Segovia made frequent trips on I-10. I suggest to you that the issue in this case is the consent. If you could direct your attention to that, the question of whether or not the language barrier was such that we have true consent here. But, Your Honor, that's not the issue they raised in their brief. They argued that he did not understand the Miranda warnings in order to waive them, but they did not argue in their brief that he did not understand the Spanish language consent form that he signed. That is a new argument being made for the first time this morning. When you watch the tape, the language difficulties are not nearly as bad as Ms. Merrick would . . . Obviously, she's going to take the more dim view of it. I'm going to take the more favorable view of it. Yes, there are some language barriers, but the district court in respect to the Miranda issue, which was the one presented to it, found that Mr. Segovia spoke fairly good, but not great English. But he said the district court found, at least as far as the Miranda warnings, that Mr. Segovia understood English well enough to understand and process and appreciate his Miranda warnings. I assume had this issue been presented to the district court, it would . . . What important time was the Miranda warning given? After the drugs were found. After? After the drugs were found and after Mr. Segovia was taken into custody. What evidence was adduced after that? I mean, in other words, he responds to that. He already does. You already have heroin in your . . . I mean, it's been seized, and now he's Miranda-ized. My guess is what difference does it make? I mean, what statements were used? What statements did he make that were not suppressed, that are challenged here? Really only two that were introduced at the suppression hearing. The trooper asked him if there was a follow car because he found it to be a common occurrence that the two vehicles traveled in tandem. So he was asking if there was another car that they should be on the lookout for. Mr. Segovia answered that there was, but that he had not recently been in contact with them and he could not identify it. And then the trooper asked him, were there more drugs in the van? And Mr. Segovia responded that he did not know because he had not packed it. Someone else had packed it. There were, in fact, more drugs in the van. They were found later. So it was a conditional plea, so we don't have an issue of those statements coming in to evidence. I mean, I guess it's possible to suppress his confession, but not the search, and there would still be sufficient evidence to convict. I would think the government would pursue the case if the statements . . . I think the statements were, as Judge Egan-Botham said, the drugs had already been found. It was the statements in the grand scheme of things were fairly . . . I'm just trying to get a handle on what we're arguing about here. I mean, the Miranda warning comes only after all of these other events have occurred. And you know, at that point, if he had said nothing, he'd still have got to . . . He'd still have gone to jail. Of course. So my question, as my colleague has just put to you, is here on a conditional plea of guilty. And my question is, if we suppress those statements, I guess I'd have trouble seeing what they really add to the case. I don't think they add a great deal, Your Honor, and I believe that the real issue is the consent to search the car. And the custodial status of the defendant. What was the initial basis for the stop? The trooper pulled out and followed the car because it was driving about 10 miles underneath the speed limit. And during the time he was following it, he noticed that it was weaving across the fog line. And he was afraid the driver, because it was about 530 in the morning, he was afraid the driver was either impaired or sleepy. It also had three Hispanic males in it. And I don't know whether he knew that or not, Your Honor. It was 530 in the morning. If he drives above the speed limit, they stop him. If he drives below the speed limit, they stop him. If he crosses the white line, I'm not suggesting anything illegal about it. It's perfectly lawful for whatever the motivation of. They don't have to be enforcing the traffic laws in their own minds. They want to check this car out. But so long as there is a basis for stopping them, it's legal and it's legal about that. But in the trooper's defense, Your Honor, it was a real part of the interstate. That's a real world they're operating in. I understand, Your Honor. But it was a real part of the interstate, and it was 530 in the morning. It was still dark, as you can see from the video. So I don't know if the trooper knew the occupants of the van when he stopped it. He may have. I just don't know. But anyway, I would submit that there was a reasonable suspicion to extend the stop based on everything the trooper knew. But I also believe that it did become a consensual encounter. The trooper had returned the Mexican ID card. He had returned Mr. Segovia's driver's license. He had told Mr. Segovia that he was not going to give him a ticket. And then the trooper said—and I'll break down so I can read exactly to you what he said. He said— What would a ticket have been for? Crossing the fog line. Illegal lane usage. Changing lanes. What was the ticket for? It would have been for illegal lane usage. Not maintaining his lane of travel. Crossing the fog line. Okay. What time of day was this? 530 in the morning. Something like that. It's a big problem in Louisiana. Well— It was an objective basis upon which to stop the cars. The car, Your Honor. But after he returned Mr. Segovia's driver's license, Trooper Parrott said that he sees a lot of bad things out here, okay? A lot of illegal things being transported up and down. And at that point, Mr. Segovia says that he's not carrying anything illegal. And he twice, verbally, not just once, he twice verbally gave consent—yes, my friend, yes, my friend—to the trooper to search his car. And he also signed the Spanish-language portion of the written consent to search form, which did say that he has been informed by the officer that I may refuse to consent to any search and that I may revoke my consent to search at any time. And, Your Honor, whether the search was given—I'm sorry, the consent was given during a time when he was not free to leave because the officer had reasonable suspicion or because it was given during a voluntary police citizen—not citizen in this case, but, you know, member of the public interaction. Well, Counsel, one can suggest that if he fully understood that he was consenting to the search that he wouldn't have done it since he knew that the car had heroin in it. But they do it all the time, Your Honor. Yes, that's true. And it was quite well concealed. It was hidden in the rear portion of the van, and it was covered in—it was full of garlic, which supposedly helped to cover the scent. It was unsophisticated enough to know that he—to go ahead and give a consent. And it does—I agree with you that people routinely do that despite the warnings and despite they've got drugs in them. Maybe it's hope against hope they won't find it or something of that sort. But on the other hand, with some real sophistication, they say no and go on. And so we know that he's an unsophisticated—he's a mule, he was driving the car, so that's what happens. Yes, sir. Does the—if this Court were to find that the consent was voluntary, does that trump an unnecessary delay to investigate? I mean, if we have an unnecessary delay that we think the officer gave him his license back and that should have been the end of it, and he went beyond what he had to do, despite he gave consent, does that consent overrule the fact that there was an unnecessary delay? Or do we still—does that void the consent because he was detained for an unnecessary length of time? Your Honor, in the Kelly case, this Court found that there was a Fourth Amendment violation, but still upheld the consent search because in the form that Kelly signed to consent, she was advised that she had a right to refuse consent. So I would say that under the Kelly case, the signing of the consent form would remove any taint of the search from the unconstitutional detention if there was one. But in this case, Your Honors, I would submit that the officer—excuse me. As I said, the consent was given either during a valedictory stop or during a police-citizen encounter. There is no evidence that the district court clearly erred when it found, again, in the Miranda context, because this wasn't raised in the context of his understanding the consent to search, that the defendant spoke English well enough to be able to understand what was being asked of him. And I just don't believe that the defendant may disagree with the district court's findings, but I don't believe that he has demonstrated that the district court clearly erred. And I ask, unless the court has any further questions for me, I ask that the decision— Since you have some extra time, and I have an interest in this license plate tracking system. Yes, sir. They used that in this case. They did. Apparently, this happens all over the country, this license plate tracking. Is that right? Your Honor, my knowledge of this is limited to this case because this is the first I've seen. So in this case, they apparently have cameras all along the interstate. Is that right? That is what the— In Louisiana. I believe from the trooper's testimony that it covered Louisiana and Texas. Two states. And so they record and then apparently store data, just photos of license plates. How often they travel up and down the—you don't know. I have no idea, Your Honor. Beyond what the trooper testified to, that he had a resource that he could search to find out how often a license plate had been seen on the interstate in a fixed period of time, I really don't know anything more than that. All right. It's not an issue in this case, but I'm interested in it. I was interested to hear of it, too, Your Honor. All right. It's the first I had heard of it. All right. If you have no more questions, Your Honor, that's all I have. Thank you. Thank you. Ms. Merrick, let me ask you—I'm going to make a confession here without being warned of my rights. I haven't viewed the tape. Do you think this Court can actually make a good decision without viewing that video? I mean, you're contesting that it was—whether it was voluntary or not. There was a finding that it was voluntary and he understood, but do you think that actually the only way we can really review this is for all of us up here to view this video? I do, Your Honor, because it is the simultaneous events that are happening. And it's just a brief part. If you just—you can skip the traffic stop and all the questions in the beginning. It really begins when Trooper Peart, after he runs the license plate check, the boss system, which Judge Graves asked about, at that point—the whole tape is 25 minutes. And this happens probably at about the—it's in the brief—at about the 14 or 15-minute mark, and it's about three minutes. You don't have to watch the entire tape, but that interaction is the crux of the argument, which is he—Trooper Peart hands him his license and says, I'm not going to give you a ticket. You understand that, right? And my client is nodding his head, and he says, yes, my friend. Yes, my friend, I understand. He doesn't, but he says he does. Yes, my friend. And he says, you understand? I'm not giving you a ticket. Yes. And then he launches into, I see a lot of illegal stuff out here, a lot of bad stuff. You don't have anything illegal in the car. No. Here, sign this form. And there's no opportunity for Mr. Segovia to ever believe that he is free to leave from that encounter, and that taints the voluntariness of his consent and extends the detention right at that point. It's brief, but he extends the detention once that boss system comes back clean. I do know a little more than Ms. Griffin about the boss system because I represent a lot of these fellas. The cameras are near the way stations. They're on those things that cross the road. They're only at the interstates that—they're at the point where you cross state lines, primarily. They're not all over the interstate system, probably because they're expensive. So they're on I-10, I-20, I-30, those places where you're going to be changing between states. And, yes, they store the data, and the troopers can sit in their car and on either their laptop or their computer system. They can plug in the license plate. It takes—you can watch in this case. It's quick. It takes a few minutes, and it comes back up and says he's made four trips in 35 days or something like that. It's a little over a month. He's made four trips, three on I-10, this one on I-20. The other ones had all been on I-10. This one on I-20. And so that's what Trooper Peart is interested in asking about is tell me about your trips. And he—Mr. Segovia-Aiella, this is not relevant other than to your question, not to the case. Well, but I mean I'm likely to see it again in other cases because now if you lie or don't remember correctly the number of times you've crossed from one state to another, then that's another basis for suspicion. And to Mr. Segovia's— Because now you said I've only been to Louisiana once, and they've got a license tracker that says, ah, you've been three times. To Mr. Segovia's credit, he's very cooperative, and he's trying to answer the trooper's questions. He says, how many trips have you made? And Mr. Segovia sort of shakes his head. He doesn't understand exactly. And then Trooper Peart says, you go to Maryland, something like that. And he says, yes. And he says, when's the last time you went? And he says, oh, about a month, something like that. And Trooper Peart says, you've been—in the last month you've been three or four times, right? Or something—and I'm not remembering this correctly because I didn't know we were going to be discussing this. But he says, yes, three or four times. My family's there. And that's when he asks him who he's going to stay with. And he says, my neighbor, my nephew. That gets all jumbled up and confused. So that is the question about—that's what I know about the BOSS system. But it's used, I believe, in every traffic stop, particularly those involving Hispanic males. That's the first thing they do now is run the license plate reader. And we've seen several in Shreveport with Trooper Peart on the other side. That's why I apply here. Makes sense. And the question was asked about was the taint dissipated. I believe something to that effect. My position is that there was nothing—there were no intervening circumstances between the illegal detention and the time that he asked for consent to dissipate the taint. It's very quick. It happens. And there's nothing. And I'm not sure that—when you watch the tape, I'm not sure Mr. Segovia is really consenting as much as he's agreeing. Yes, my friend. Yes, my friend. That's his response throughout the tape. Yes, my friend. Whatever the trooper says. Yes, my friend. He just wants this to be over, and he's going to do whatever the trooper asks him, and he's not going to say, hey, I want to leave. Just Higginbotham asked about the giving of consent. Yes, we see it all the time that they give consent when there are drugs in the car. I, as a defense lawyer, my position is they consent because they don't know they don't have to. They don't feel free to leave. They're intimidated by the trooper's presence, the three officers on the scene, and they believe that they have to consent to the search of the car, and so they do. Otherwise, why would you? You know there are drugs in the car. Say no. And they don't. They do it routinely. They say yes, and I think it's because of the intimidating police presence. We all admit that we're afraid of the police when we get pulled over, yet we expect our clients to say, hey, wait, I don't want to have this conversation with you, and they're just not going to do that. We've been trained otherwise by our mothers to say, yes, you're an authority figure. I'm going to do what you ask me to do, and I'm going to hope that this encounter ends in a pleasant manner. One more question was asked. So the form, we do not dispute. My time is up again. We do not dispute the form says Mr. Segovia can refuse the search of the car. Trooper Peart never told him he could refuse. He doesn't read the form. He signs it like it's a traffic ticket. He doesn't even read it. He just signs his name. And so it's my position that he never knew he could refuse the consent of the search of his vehicle. Thank you. Thank you. Thank you both. And Ms.